J-S70029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.H. A/K/A R.L.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3414 EDA 2015 |

Appeal from the Decree October 13, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000644-2015, CP-51-DP-0000831-2010,
FID: 51-FN-002045-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: R.H. A/K/A R.J.L.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3415 EDA 2015 |

Appeal from the Decree October 13, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000645-2015, CP-51-DP-0000832-2010,
FID: 51-FN-002045-2010

IN THE INTEREST OF: R.H. A/K/A : IN THE SUPERIOR COURT OF
R.A.J.H., A MINOR : PENNSYLVANIA
  :
  :
  :
APPEAL OF: J.H., MOTHER : 
  :
  :
  :
  :
  : No. 3416 EDA 2015

Appeal from the Decree October 13, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000646-2015, CP-51-DP-0000833-2010,
FID: 51-FN-002045-2010

BEFORE:  OLSON, OTT, and MUSMANNO, JJ.

MEMORANDUM BY OTT, J.: **FILED NOVEMBER 18, 2016**

J.H. ("Mother") appeals from the October 13, 2015 decrees involuntarily terminating her parental rights to her twin sons, R.H. a/k/a R.L.H. and R.H. a/k/a R.J.L.H., born in November of 2004, and R.H. a/k/a R.A.J.H., born in November of 2005 (collectively, "the Children").  We affirm.[1, 2]

---

[1] The parental rights of the Children's father, R.L.H., Jr., ("Father"), were involuntarily terminated by separate decrees entered on October 13, 2015. Father filed notices of appeal, docketed at Nos. 3481, 3482, and 3483 EDA 2016.  This Court consolidated Father's appeals *sua sponte* and disposed of them by separate memorandum.  ***See In re R.H.***, ***et al.***, 2016 Pa. Super. Unpub. LEXIS 3244 (filed September 7, 2016).

[2] We note that the certified record in this case was originally due on December 14, 2015.  However, this Court did not receive the record from the trial court until March 9, 2016, well past the due date.  As a result, the
*(Footnote Continued Next Page)*

- 2 -

The record reveals that Mother is diagnosed in the mild mental retardation range. ATA Report, 6/22/11, at 6. In addition, the Children suffer from mild intellectual disability and autism. N.T., 10/13/15, at 121. The Philadelphia County Department of Human Services ("DHS") began providing in-home services for this family in 2004, due to the failure to thrive of the twin babies. Trial Court Opinion, 3/4/18 at 1-2.

In October of 2010, the Children were removed from Mother's and Father's custody after having been found living among "three adults[,] and [the Children were three of] four children living in an efficiency apartment. There was one full size mattress and a deflated twin mattress on the floor. There were roaches, wire under the floor, an extension cord running outside to a deep freezer, the children were in diapers, and the children were not in school." Trial Court Opinion, 3/4/16, at 2 (footnote omitted). The Children were placed in the care of their paternal great aunt, T.B. ("Aunt"), who is a pre-adoptive resource. *Id.*; N.T., 10/13/15, at 207.

On November 18, 2010, the Children were adjudicated dependent. The Children's permanency goals were return to parent. Family Service Plan ("FSP") objectives were assigned to Mother, requiring her to participate in the following: weekly visits with the Children, a parenting capacity

*(Footnote Continued)* ─────────────

briefing schedule in this matter was delayed by nearly three months. This Court has acted diligently in attempting to facilitate the prompt processing of this appeal.

evaluation, a bonding evaluation, individual and family therapy, and family school. Further, Mother was required to obtain appropriate housing. Trial Court Opinion, 3/4/16, at 3.

The trial court set forth the additional factual history, which the record evidence supports.

In 2011, all three adults were given a[] [parenting capacity] evaluation, which stated that as a unit of three,[3] there is parental capacity.

Due to the special nature of the three parents, Mother and Father were given numerous opportunities to visit with the Children so that they would gradually adjust to taking care of three special needs children. On November 4, 2010, the parents' visits changed to liberal supervised visits, to be supervised by . . . [A]unt. On June 30, 2011, the parents' visits were changed to supervised visits at the agency. On May 14, 2012, the parents' visits were increased to one supervised visit at the agency and supervised visits in the home of Father's paramour's mother, supervised by DHS. On October 10, 2013, the Children started to have unsupervised visits with their parents at . . . [A]unt's home for five hours on Saturdays.

The unsupervised visits were expanded to overnight visits (Tuesday through Thursday) on January 2, 2014. The agency was assigned to conduct spot checks three times a week during the overnight visits with the Children. The unsupervised overnight visits were temporarily suspended after a CPS report was filed alleging physical abuse. The report alleged that Mother had beaten the Children with a belt that left bruises on the Children's arms. The Children were subsequently seen at the Emergency Department of Children's Hospital of Philadelphia ("CHOP"). The examining physician, Dr. Cynthia Mollen, testified that the Children's bruising were consistent with being hit with a

_____

[3] Mother lives with Father and his paramour, with whom he had two children at the time of the subject proceedings. The three adults co-parented. Trial Court Opinion, 3/4/16, at 1.

belt. Dr. Mollen stated that the Children were in severe pain as a result of the beating. After this report was substantiated, the parents were allowed continued visits with pop-up visits by the foster care agency.

On or about December 16, 2014, [Denise] Burton (Community Umbrella Association ("CUA") - Wordsworth case manager) was informed that the parents had moved from Philadelphia and relocated to the Poconos. The [c]ourt was informed on January 29, 2015 of the parents' move. At this hearing, the visits were changed to supervised visits. Father initiated contact with the Children via text message on February 7, 2015. After the move, [Mother's and Father's] first visit with the Children was in May, 2015. In the interim, the Children did not visit with their parents from December 9, 2014 until the beginning of May, 2015. Any subsequent visits involved DHS transporting the Children to the Poconos; the parents did not visit the Children in Philadelphia since their move in December, 2014.

Trial Court Opinion, 3/4/16, at 3-4.

On September 21, 2015, the Defender Association Child Advocacy Unit ("DACAU") filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court held a hearing on October 13, 2015.[4] DACAU presented the testimony of the following witnesses: (1) Erica Williams, Psy.D., a licensed psychologist from the Assessment and Treatment Alternatives, Inc. ("ATA"), who performed parenting capacity evaluations in 2011 and 2013; (2) Denise Burton, *via* telephone, the former clinical case manager at the CUA - Wordsworth; (3) Brendan Bradley, a mental health worker at the Northeast

_____

[4] The Honorable Vincent L. Johnson presided over the subject proceedings. He had presided over the Children's dependency matters since 2012. N.T., 10/13/15, at 375.

Treatment Center ("NET"); (4) Leslie Toomer, a supervisor at DACAU; and (5) Samantha Salvatico-Parent, the foster care case manager at CUA - Wordsworth. DHS presented the testimony of Ms. Todd, the DHS caseworker. In addition, Mother and Father testified on their own behalf.

By decrees dated and entered on October 13, 2015, the trial court involuntarily terminated Mother's parental rights. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rules of Appellate Procedure 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[5] The trial court filed its opinion pursuant to Rule 1925(a) on March 4, 2016.

On appeal, Mother presents the following issues for our review:

A. Whether the trial court erred in failing to find that for the six months immediately preceding the filing of the petition, when mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment for and stabilize her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to relinquish her claim to her child or refused and/or failed to perform parental duties[?]

_____

[5] The trial court also issued goal change orders dated October 13, 2015, and Mother timely filed notices of appeal. We conclude that Mother's appeals from the goal change orders are waived because she has not raised any claim regarding them in her brief. *See Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved. . . .") (citations omitted).

B. Whether the trial court erred in failing to find that for the six months immediately preceding the filing of the petition mother had consistent contact and visits with her children, mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment for and stabilized her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to relinquish her claim to her child or refused and/or failed to perform parental duties[?]

C. Whether the trial court erred in finding that there were repeated and continuing findings of the incapacity, abuse, neglect and/or dependency of these minor children by mother, when mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment for and stabilized her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to relinquish her claim to her child or refused and/or failed to perform parental duties[?]

D. Whether the trial court erred in finding that the conditions which led to the removal or placement of the child continue to exist, as to mother, when mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment for and stabilized her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to relinquish her claim to her child or refused and/or failed to perform parental duties[?]

E. Whether the trial court erred in finding that the conditions which led to the removal or placement of the children continue to exist and termination of parental rights would best serve the needs and welfare of the children, when mother can remedy the conditions within a reasonable period of time, and when mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment for and stabilized her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to relinquish her claim to her child or refused and/or failed to perform parental duties[?]

F. Whether the trial court erred in failing to recognize that DHS made and were continuing to make, along with the trial court's reunification schedule, reasonable efforts towards reunification, in failing and/or refusing to help find a viable option or to consider options other than terminating mother's parental rights, when mother's children were bonded with her and mother completed parenting classes and family school, consistently sought treatment and stabilized her mental health issues, was visiting with her children, obtained housing for herself and her children, completed her [FSP] objectives, and did not intend to erred [sic] in terminating the rights of mother, when she obtained housing and parenting training and therapy, and prepared to provide for the medical care, care [sic], and maintenance of her children?]

G. Whether the trial court erred in terminating the rights of mother where it was not supported by clear and convincing evidence and not in the best interests of the children, and there was a bond between mother and her children and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the children, pursuant to 23 Pa[.]C[.]S[.]A[.] [§] 2511(b)[?]

H. Whether the trial court erred in ruling that mother's witnesses from CYS, the behavior specialist, and the TSS worker that worked with the parents and their other special needs children in their home in Mahanoy City could not present evidence regarding mother's participation in the care of the children in her household and her ability to care for her children, because said evidence was not relevant[?]

I. Whether in addition the trial court erred in denying mother's petition for the behavior specialist and TSS worker to be paid fees of $33 per hour for their time in participating in the hearing on October 13, 2015[?]

J. Whether the trial court erred in ruling that the expert witness's [sic] testimony was credible, when said witness was simply testifying her [sic] expert opinion[?]

K. Whether the trial court erred in ruling that DHS worker Todd was precluded from introducing documents into evidence, because the city solicitor failed to submit a list of exhibits[?]

L. Whether the trial court erred in ruling that DHS worker Todd's testimony was only partially credible, when she was the worker throughout the life of this case and whose testimony had been found credible at every hearing throughout the life of this case and was following the specific reunification plan of the trial court until the relocation of the family[?]

M. Whether the trial court erred in not finding that the children and mother had a bond, when the DHS worker Todd, mental health worker from NET, Brendan [Bradley], and testified [sic] to the bond[?] Dr. Williams also testified to her bonding evaluation.

N. Whether the trial court erred in not considering that the continuances of the permanency review and the failure to restart the reunification plan of the trial court was a factor in the visits in 2015, being less frequent than in 2014[?]

O. Whether the trial court erred in finding that there were reasonable efforts, when there was no DHS worker assigned to the case [sic] December, 2014 through March, 2015 when DHS social worker Todd was on leave[?]

P. Whether the errors committed above deprived mother of her right to due process and equal protection[?]

Mother's brief at 1-2.[6]

We consider Mother's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

_____

[6] Mother's brief is unpaginated. For ease of reference, we have assigned page numbers to her brief beginning with the statement of questions involved.

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of

parental rights. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be

- 11 -

without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

This Court has explained that, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Further, parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id*. at 340.

With respect to Section 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. (citation omitted).

We note at the outset that Mother raises sixteen issues on appeal. Our Supreme Court has explained that raising a staggering number of issues is not effective appellate advocacy and is "borderline abuse of the legal system." *Commonwealth v. Robinson*, 864 A.2d 460, 480 n.28 (Pa.

2004). The Court stated that, "multiplying assignments of error will dilute and weaken a good case and will not save a bad one." *Id.* (emphasis omitted) (*quoting* **Jackson**, "Advocacy Before the United States Supreme Court," 25 Temple L. Q. 115, 119 (1951)).

Further, we note that the Rules regarding the content of briefs provide, "[t]he summary of argument shall be a concise, but accurate, summary of the arguments presented in support of the issues in the statement of questions involved." Pa.R.A.P. 2118. Mother's summary of argument in her brief is deficient in that it consists of one sentence that references the needs and welfare of the Children. In addition, Mother's argument in her brief fails to comply with the Rule providing,

> The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type of distinctively displayed -- the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent.

Pa.R.A.P. 2119. Mother's argument consists of twelve pages and is not divided into any parts.

In addition, the Rules regarding briefs provide "[l]ettering shall be clear and legible and no smaller than 14 point in the text and 12 point in foot notes." Pa.R.A.P. 124(4); Pa.R.A.P. 2135(c). In the statement of questions involved, statement of the case, and summary of argument, Mother's counsel used lettering smaller than 14 point. In the argument section, her counsel used lettering that is smaller than, and other lettering

that is greater than, 14 point. In addition, the text in the entire substantive portion of Mother's brief is not double spaced as required by Rule 124(3). Pa.R.A.P. 124(3) ("Text must be double spaced, but quotations more than two lines long may be indented and single spaced. Footnotes may be single spaced. . . .").

Moreover, the Rules limit a principal brief to 14,000 words, unless the brief does not exceed 30 pages. Pa.R.A.P. 2135(a)(1). Where the brief exceeds 30 pages, a certificate of compliance with the 14,000 word-count limit must be filed. *Id.* Here, the substantive portion of Mother's brief spans 22 pages. However, the text is single spaced and/or spaced one and a half lines apart. Had Mother's counsel complied with the Rules by double spacing the text, Mother's brief would have exceeded 30 pages. As such, we conclude that Mother's counsel should have filed a certificate of compliance with the word-count limit. She failed to do so.

Pa.R.A.P. 2101 underscores the seriousness with which this Court takes deviations from procedural rules, as it permits us to quash or dismiss an appeal for procedural noncompliance. Therefore, we strenuously caution Mother's counsel about this conduct. Here, we address Mother's appeal insofar as the Rules permit.

We observe that Mother fails to provide meaningful discussion with citation to any statutory or case authority in the argument section of her brief with respect to issues F, H, I, J, K, L, N, O, and P. As such, we

conclude that Mother has waived those issues.[7] ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); Pa.R.A.P. 2119(b).

With respect to Section 2511(a)(2), Mother asserts in issue C that the evidence does not support termination because the Children "were bonded with her," and she completed her FSP objectives. We disagree.[8]

The trial court set forth its factual findings, credibility determinations, and conclusions of law on the record in open court at the end of the evidentiary hearing. ***See*** N.T., 10/13/15, at 369-380. The court found persuasive the testimony of Erica Williams, Psy.D., the licensed psychologist from the ATA, who performed parental capacity evaluations in 2011 and 2013. Dr. Williams testified that the evaluations were "taken in conjunction with the three adults [who] would be raising the children. So the findings were based on if they were to work as a unit." ***Id.*** at 21. The court properly related Dr. Williams' findings that "neither of the parents individually were

---

[7] To the extent Mother argues that DHS did not provide reasonable efforts to reunify her with the Children, the record belies her contention. Moreover, our Supreme Court has held that proof of reasonable reunification efforts by a child welfare agency is not necessary to support a decree terminating parental rights under Section 2511(a)(2). ***See In re D.C.D.***, 105 A.3d 662, 673-674 (Pa. 2014).

[8] Based on this disposition, we need not review Mother's issues A, B, D, and E because they relate to Section 2511(a)(1), (5), and/or (8). ***See In re B.L.W.***, ***supra***.

capable of being parents. . . ." ***Id.*** at 371. However, Dr. Williams found "as a corporate unit, . . ., given the proper structure, these parents as a unit possibly could parent." ***Id.*** The trial court explained:

> And what we did was, and what DHS did was to allow structure to give the parents all the help they needed over 60 months to show the [c]ourt that as a corporate unit, a unique corporate unit, of one man and two women, they could provide proper parental care. . . . In 60 months, we found based on the testimony of Dr. Williams today . . ., which is un-refuted[,] that even now presently . . . not only . . . did they not have the capacity individually . . . to parent[,] but now in their corporate unit, they are found not to have the capacity to . . . parent for these children.

***Id.*** at 371-372.

Upon careful review, Dr. Williams' testimony supports the court's findings. Indeed, Dr. Williams testified that Mother and Father do not currently have the capacity to parent either individually or collectively. N.T., 10/13/15, at 63. Dr. Williams explained as follows.

> [T]here was some progress with this family. But the concern is that over time . . . [t]he issues present similarly despite the intensive intervention. The availability of services, and the steps identified for the individuals to take [sic]. So, that they are eager, they initiate the steps but then they fall off, and they stop doing what they've been asked to do, so the progress is stunted. So after intervention[,] after removal of children[,] despite the stated goal of wanting the children, there seems to be a . . . repeat of going so far[,] stepping back, going so far[,] stepping back.

***Id.*** at 27-28.

- 16 -

Further, the trial court noted Dr. Williams' testimony that the parents "simply disappeared, moved with nothing" when they relocated to the Poconos. Trial Court Opinion, 3/4/16, at 18. The court reasoned, in part:

Despite all the efforts that DHS and other supportive agencies have attempted to do to provide [for] this family[,] they chose in December [of 2014] to leave [Philadelphia] and to abandon their children, they chose to do that. They made no attempt to contact anyone about their leaving until March. Then they made no effort to have visitation until much later.

*Id.* at 373-374. Moreover, the trial court explained:

[A] question was asked of Dr. Williams by one of the attorneys, because of the parents['] intellectual disability [whether] we should excuse them for their inconsistency, for their inability to follow through with the protection and support of their family[.] Dr. Williams said, no, it had nothing to do with their intellectual disability[.] [I]t was a willful act.

*Id.* at 375. Indeed, on direct examination by the Child Advocate, Dr. Williams testified:

Very often, people with developmental disabilities can thrive as parents particularly given the right supports. In this case[,] the recommendations have been made for years that they get certain supports. And the concern here is despite the provision of those supports . . . that they're making multiple choices to do different things that place the children at harm that cause them to leave the children's lives, and that's not something that necessarily can be explained by developmental disability[,] rather than a choice in behavior.

*Id.* at 35-36.

In short, the court found that "there was no other credible testimony presented to show that Mother had resolved any of the issues that brought the children into care." Trial Court Opinion, 3/4/16, at 18. Based on the

- 17 -

foregoing testimonial evidence, and upon thorough review of the subject proceedings, we agree. The record overwhelmingly demonstrates that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children, for a period of five years at the time of the subject proceedings, to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the evidence demonstrates the causes of Mother's incapacity, abuse, neglect, or refusal cannot or will not be remedied. As such, Mother's issue related to the termination of her parental rights under Section 2511(a)(2) fails.

In issues G and M, Mother argues that the record does not support termination of her parental rights pursuant to Section 2511(b). Mother requests this Court, at minimum, "to remand for further testimony and evidence regarding the bond between" Mother and the Children. Mother's brief at 21. Specifically, she argues that there is the need "for an updated formal bonding evaluation to aid in the decision regarding the impact of the termination of parental rights." *Id.* We conclude that this issue has no merit.

> This Court has explained as follows:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents'

- 18 -

parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In addition, in considering the affection a child may have for his or her natural parents, we have explained as follows.

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d at 535 (internal citations and quotation marks omitted).

- 19 -

Moreover, our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, *supra*. The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the trial court found as follows at the conclusion of the testimonial evidence:

> [W]hile it is true that there's been testimony that there is a bond clearly of some level, the [c]ourt does not find [it] to be a parental bond. The testimony has been [that] the children enjoy being with their parents. . . .
>
> [T]he court does not really find from the basis of the testimony that there is a parental bond[.] [I]t is a friendly bond…. [I]t's not a parental bond, and while there [would be] a negative impact according to Dr. Williams, Dr. Williams also indicated it [would] not [cause] irreparable harm if termination was to take place.

N.T., 10/13/15, at 377-378.

Dr. Williams testified on direct examination that the Children "would experience a loss . . . and they absolutely would need to have support and treatment to ameliorate any of the outcome of the loss of [Mother and Father] from their lives." N.T., 10/13/15, at 68. Nevertheless, she clarified that, with respect to the "irreparable harm" in this context, "the big part of it is will it prevent them from ever attaching in a healthy way to another adult?" *Id.* at 69. She continued:

> In this case, the children were doing very well with their placement, they were thriving, in fact, their behaviors and their overall functioning had improved. So they would be negatively impacted[,] but there's no reason to think that it would be irreparable harm, and [that] they wouldn't be able to be successful in the absence of their parents.

*Id.*

Further, Dr. Williams testified that it is in the Children's best interest to have permanency. *Id.* at 37-38. She testified that, "the parents haven't shown any evidence of being able to establish permanency, even with significant supports." *Id.* at 33. In addition, Dr. Williams testified that, "with special needs[,] the ones that these children are diagnosed with[,] routine structure [is] [in]credibly important to help manage their behaviors." *Id.* at 36. She continued on direct examination:

> Q. And if the parents as in this case . . . are in and out of the children's lives[,] in your opinion is that more detrimental or helpful to the children as far as their emotional well-being?
>
> A. Long term it's detrimental. Often times in a short term you see the children be excited at the return of the parent but it creates that underlying lack of security, lack of attachment, and

kind of inability to know if your needs are going to be met, it's . . . long term, that's very detrimental.

Q. So in the best case scenario, your opinion for these particular children, would it be best then to sever that [relationship]?

A. Based on . . . all of the efforts made, I don't have reason to believe that there will be substantial enough changes for the parents to provide the consistency [the Children] need. So at this time the best option would be to give them that provider who can give them that long term care.

*Id.* at 38.

Ms. Burton, the clinical case manager at CUA-Wordsworth, testified that she was assigned to the Children's case from the time of their placement until August 2015. During that time-period, she visited the Children twice per month at both Mother's home and Aunt's home. *Id.* at 76. Ms. Burton explained that the Children's bond with Mother was affected when she moved to the Poconos. She testified that the Children "were used to seeing their parents from Tuesday to Thursday, and at one point it was from Wednesday to Saturday, and they looked forward to that. But after [the parents moved to the Poconos], they had no idea when visits [were] ever going to occur." *Id.* at 102. She explained that, "the interruption of not having a visit . . . [made it] difficult to establish an ongoing bond." *Id.* at 101. Importantly, Ms. Burton agreed on redirect examination that the Children have a parent-child relationship with Aunt, and that Aunt is able to meet the specific needs of each child. *Id.* at 116.

Samantha Salvatico-Parent, the foster care case manager at CUA-Wordsworth, testified that the Children have had supervised visits with Mother and Father in the Poconos on three occasions since their relocation, with transportation being provided by DHS each time. *Id.* at 203-205. She testified, as did Brendan Bradley, the mental health worker at the NET who provides counseling for the Children, that the Children have a parent-child relationship with Aunt. *Id.* at 148-149, 202-203.

Based on the foregoing, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(b). The testimonial evidence demonstrates that terminating Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. As such, we reject Mother's argument that additional evidence, including an updated formal bonding evaluation, was necessary for the trial court's bond analysis. *See In re Z.P.*, 994 A.2d 1108, 1115-1116 (Pa. Super. 2010) (citations omitted) (stating that Section 2511(b) does not require a formal bonding evaluation). Mother's issues related to the termination of her parental rights under Section 2511(b) fail.

In summary, the testimony on direct examination of Leslie Toomer, the Child Advocate social worker for the family, supports the decrees involuntarily terminating Mother's parental rights as follows:

> Q. [W]hat if any, concerns does this raise for you as to [Father's] and [Mother's] ability to parent these children?

A. [I]t's my opinion that the parents have sabotaged their likelihood of reunifying with their children twice, . . . [.] [T]he first time when we were moving toward reunification, and there was an incident of physical discipline with a belt, that rose to a child line report being made[.] I thought that in that instance maybe that they were overwhelmed because it was the very first visit that all of the children were at the home again, . . . for unsupervised visits, so, I did have some concerns about that[.] [T]hen to leave abruptly without letting not necessarily me know as a Child Advocate social worker supervisor, but the other workers on the case who were very vested in making sure the transition was smooth and reunification occur[.] [I]t just spoke to the level or lack of insight that the parents have in dealing with these children, leaving them[.] [The Children] may not understand why they left[.] [I]t shows there's an inconsistency and the level of care that you are willing to provide[,] where the kinship parent has been a consistent provider for five years for these children.

N.T., 10/13/15, at 182-183. Based on our thorough review of the record evidence, we discern no abuse of discretion by the trial court in involuntarily terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2016